IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION


UNITED STATES OF AMERICA,       )
                                )       June 10, 2019
                                )
        -versus-                )       Charleston, SC
                                )
ZAKARIA ABDIN,                  )       2:17-283-1
                                )
        Defendant.              )


TRANSCRIPT OF SENTENCING

BEFORE THE HONORABLE RICHARD M. GERGEL
UNITED STATES DISTRICT JUDGE, presiding


A P P E A R A N C E S:

For the Government:   NATHAN S. WILLIAMS, AUSA
                      SEAN KITTRELL, AUSA
                      US Attorney's Office
                      151 Meeting Street, Suite 200
                      Charleston, SC 29401


For the Defendant:    CODY J. GROEBER, ESQ.
                      Federal Public Defender
                      PO Box 876
                      Charleston, SC 29402


Court Reporter:       KAREN E. MARTIN, RMR, CRR
                      PO Box 835
                      Charleston, SC 29402


Proceedings reported by stenographic court reporter.
Transcript produced with computer-aided transcription
software.


Karen E. Martin, RMR, CRR
US District Court
District of South Carolina

2

**DEFENDANT'S EXHIBITS**

| NO. | DESCRIPTION | ID | EVD |
|-----|-------------|-----|-----|
| 1 | Letter | 17 | 17 |

Karen E. Martin, RMR, CRR
US District Court
District of South Carolina

Monday, June 10, 2019

(WHEREUPON, court was called to order at 10:33 a.m.)

THE COURT:  Good morning.  Please be seated.

Mr. Williams, ready to call your next case, sir?

MR. WILLIAMS:  Yes, Your Honor.  Good morning. May it please the Court?  We're here on Docket No. 2:17-283, United States of America vs. Zakaryia Abdin. Your Honor, Nathan Williams for the Government.  With me today is Jennifer Burke.  She's with the National Security Division with the Department.  She's been involved in the case from the inception, and I think you've probably seen her name on some of the papers filed.

THE COURT:  I have.

And how do you spell the last name?

MS. BURKE:  Burke, Your Honor, B-U-R-K-E.

THE COURT:  Thank you.

MS. BURKE:  Thank you.

THE COURT:  Okay.

MR. WILLIAMS:  And, Your Honor, Mr. Kittrell is here as well.  As Your Honor knows, he's had some health issues.

THE COURT:  Well, we've been thinking about you, Mr. Kittrell.  Hope you're doing better.

MR. KITTRELL:  Thank you.

THE COURT:  Good to have you here, sir.

MR. WILLIAMS: And, Your Honor, we're set today for sentencing.

THE COURT: Mr. Groeber, good morning, sir.

MR. GROEBER: Good morning, Your Honor.

THE COURT: Hope you're doing well today?

MR. GROEBER: Thank you, Your Honor.

THE COURT: I want to confirm that you have had a chance to review the Presentence Report?

MR. GROEBER: Yes, Your Honor.

THE COURT: And you have had an opportunity to review that report with your client?

MR. GROEBER: Yes, Your Honor.

THE COURT: Ms. Perry, could we swear the defendant, please?

THE CLERK: Please raise your right hand.

(WHEREUPON, the defendant was sworn.)

THE DEFENDANT: Yes.

THE COURT: Good morning, Mr. Abdin.

THE DEFENDANT: Good morning.

THE COURT: I want to confirm, sir, you've had an opportunity to review the Presentence Report?

THE DEFENDANT: Yes.

THE COURT: Had a chance to review it with Mr. Groeber?

THE DEFENDANT: Yes.

THE COURT:  Very good.

Mr. Groeber, are there objections to the Presentence Report?

MR. GROEBER:  There are, Your Honor.

THE COURT:  Let's take our time, because I understand there were a number --

MR. GROEBER:  Yes, Your Honor --

THE COURT:  -- and I want -- I want to make sure that we do these methodically --

MR. GROEBER:  Yes, Your Honor.

THE COURT:  -- okay?

MR. GROEBER:  And I will -- I will say, I think they actually have been whittled down because some of them have been incorporated within the document itself.

THE COURT:  Right, and which is not uncommon. Or sometimes, you know, initially when you raise objections, they're waived or whatever.

MR. GROEBER:  Yes, Your Honor.

THE COURT:  So that's why I always kind of go through at the hearing what's actually still our live objections.

MR. GROEBER:  Yes, Your Honor.

THE COURT:  So please proceed.

MR. GROEBER:  Your Honor, the first objection is to release status.  And this is related to a couple of the

other objections in paragraphs and that has to do with whether Zak's juvenile conviction is relevant conduct or not. That's the kind of overarching question. And it certainly appears from the Government's arguments and memorandum that they agree that this was part of one larger event that Zak was radicalized as a youth. And they certainly seem to believe that his -- that this is all one continuing --

THE COURT: Well, what the Government believes is -- is of interest but of no great consequence. Here is the real question. Are you arguing that he should not have criminal history points despite his prior conviction? Is that the gist of the argument?

MR. GROEBER: Yeah, that's the gist of it.

THE COURT: I thought the gist of the argument was, so it's not unusual. You and I have -- I think you've had cases like this where someone will rob a bank. And then they will get out of prison, they'll rob a bank again. They may even go back to the same branch. I had one case where they went back to the same branch.

Now, you could say that all that's part of one code -- course of conduct and all that, same parties. But I think it's quite clear, under the sentencing guidelines, that you don't get a -- you don't get to eliminate a prior conviction because you commit the same crime again.

I think you make a valid point that -- that to the extent that he has already been punished for certain specific conduct, I should not reach back into the act as a basis to punish him again.  I think that's a valid point to make.

But a lot of your defense, as I've read the various memoranda that you have presented, suggests that he didn't really mean what he said and that things weren't intentional or were mischaracterized.  And to the extent that prior conduct may provide some insight of what true intent was, which is an important element here, of course, then it's relevant, not as relevant conduct, but just whether it's part of your defense of the validity of the defense that you assert.

So let's identify the specific paragraphs you're addressing here so I can --

MR. GROEBER:  Thank you, Your Honor.

THE COURT:  -- that you think should be -- in the Presentence Report that you believe are affected by your argument here.

MR. GROEBER:  Your Honor, it's the release status.

THE COURT:  Okay.

MR. GROEBER:  That's on Page 2.

THE COURT:  Page 2.  I don't know what you --

when you say release status?

MR. GROEBER:  It's at the very top.

THE COURT:  Okay.  Hold on just a second here. I -- release status?  Okay.  Arrested March 30, 2017, ordered detained.  You object to that?

MR. GROEBER:  That is correct.

THE COURT:  I thought it was correct.

MR. GROEBER:  But we think that it should include the time that he was in the Department of Juvenile Justice.

THE COURT:  Okay.  I overrule that objection.  I find that the sentencing guidelines make clear 1B1.3 App. Note 5 makes clear that that prior conduct counts as a separate offense.

What else?

MR. GROEBER:  Related to that, Your Honor, are Paragraphs 54, which is -- that assigns the two points for the --

THE COURT:  Hold -- hold it.  Hold it just a second.  Let me get to that.  And that, of course, goes to this issue of giving two criminal history points.  I overrule that objection on the same basis.  What else?

MR. GROEBER:  And 56 and 57, this is all on the same basis.

THE COURT:  I've looked at Paragraphs 56 and 57.

And again, for the same reasons, I overrule that objection.  Okay?

MR. GROEBER:  All right.  Thank you, Your Honor.

THE COURT:  Yes, sir.

MR. GROEBER:  Going back now to Paragraph 7.

THE COURT:  Okay.  Hold on a second.  Let me get there.  Yes?

MR. GROEBER:  Paragraph 7, at the last sentence, states that Mr. Abdin created a social media account in what appears to be an effort to renew his attempt to join ISIS.

THE COURT:  Okay.

MR. GROEBER:  And that -- we object.  That was not his intent to --

THE COURT:  What -- what --

MR. GROEBER:  -- join ISIS at that time.

THE COURT:  -- what was his intent?

MR. GROEBER:  His intent was to support, to --

THE COURT:  Provide material support to the enemy?

MR. GROEBER:  No.  It was to -- to speak in support of ISIS but not to actually -- his intent at that time was not to go join ISIS, to go be a fighter for ISIS, when he created that platform on January 3rd.

THE COURT:  See, I don't really quite know how

to make of this because your -- your client has -- I read the psychiatric evaluation you presented to the Court. And, you know, at one point he says, you know, I was trying to join ISIS.  And at another point he says I wasn't trying to join ISIS.  I think it's -- I hear what you're going to say.  I'm glad to hear more.  But at this point, I think there's sufficient basis in the record to support the statement as written.  I overrule that objection.

MR. GROEBER:  Thank you, Your Honor.

THE COURT:  Yeah.

MR. GROEBER:  Next is on Paragraph 8.

THE COURT:  Okay.

MR. GROEBER:  This second sentence reads that Abdin began communicating with an individual whom he believed to be a supporter of ISIS.

THE COURT:  Okay.

MR. GROEBER:  That is accurate, but it does not tell the whole story.

THE COURT:  What's the rest of the story?

MR. GROEBER:  The rest of the story is that the Government agent reached out to Zak and commented on his social media and started the conversation.

THE COURT:  So the social media friendly to ISIS attracted the attention of the authorities?

MR. GROEBER: That is correct. And they commented in a way that --

THE COURT: They respond because they -- they want the person to -- who may be a threat to national security, they want to communicate with them. If they said this is the FBI, I don't think your client would have responded very friendly, do you?

MR. GROEBER: Well, um, we wish that they had.

THE COURT: Well, okay. But the point was, the response here that generated was an undercover agent; is that correct?

MR. GROEBER: That's correct, Your Honor.

THE COURT: The undercover agent was attempting to act like he was an ISIS supporter. And he was -- and he communicated with your client; is that correct?

MR. GROEBER: That's correct. And he reached out and commented first.

THE COURT: He reached in response to the social media. I overrule that objection to Paragraph 8. I think it's a reasonable inference based upon the facts. But I'm -- on all of these that I'm really -- if you have additional evidence you wish to offer, I will weigh those -- that evidence. But at this point that is -- there is sufficient evidence in the record to support that. Okay. What else?

MR. GROEBER:  Now we're on to Paragraph 45.

THE COURT:  Okay.  Okay?

MR. GROEBER:  If I could have one second, Your Honor?  (Pause)  Okay, Your Honor.  Sorry.

THE COURT:  Yes.

MR. GROEBER:  Paragraph 45, the PSR states Abdin discussed -- well, let me -- let me back up.  We have a general objection to the inclusion of these jail calls.

THE COURT:  Because?

MR. GROEBER:  Because we don't believe that they're relevant to the crime in this case --

THE COURT:  Well, they may be --

MR. GROEBER:  -- of traveling to Jordan.

THE COURT:  I kind of agree to they may not be specifically relevant to, because he's not theoretically at that point engaging in trying to give material support to the enemy and to the -- to a terrorist organization.  So I think that's probably correct.  It goes to your defense that he didn't mean it when he made these statements to this undercover agent.  He didn't mean it.

And the relevant evidence, there's a lot of relevant evidence that needs to be weighed in -- and -- in evaluating that defense.  And one of them is subsequently made statements.  Are they inconsistent with that or are they consistent?  And it's just a -- so I think it is

potentially relevant to your defense.  I tend to agree with you that -- that it's not specifically relevant to the crime itself.  But I think it's appropriately in the PSR.  And it really addresses to my -- in my way of thinking, the potential what appears to be the defense here.

So I overrule the general objection to the consideration of the relevancy of jail calls.  Though I agree with defense that it is not a specific element of the crime itself.

MR. GROEBER:  And just generally, Your Honor, to put these into context, we think it's fundamentally unfair to use jail calls within a month of arrest of an 18-year-old who's speaking to his mother trying to make her feel better.

THE COURT:  Well, I'm not sure some of these comments would make -- would give his mother much comfort, frankly.  I saw that as your defense.  I don't -- maybe I'm missing something there.  But, you know, telling his mother he's not really sad about it, he's happy what's happened, that doesn't seem to comfort his mother very much.  But perhaps there's an explanation you could give me about how that would be comforting.  I don't see that.

I think the issue of -- of age is a relevant discussion we ought to have.  He's 18 years old.  There

are other factors as well to consider.  But age is certainly a factor the Court ought to weigh.

MR. GROEBER:  Thank you, Your Honor.

Specifically now to Paragraph 45, there is -- the PSR claims that Mr. Abdin discussed possible jail terms, which is true, and then stated he had no regrets. We do not believe that that statement is in -- that -- he did not say those words.  And I think the Government agrees with us that those specific words, he did not have regret -- I don't have regret is not stated by Mr. Abdin.

THE COURT:  What's the Government's response to that?

MR. WILLIAMS:  Your Honor, I think it's a semantic one, largely.  I think the following line, he did state that I am not sad at all; on the contrary, I am happy referenced to his --

THE COURT:  How about the regrets?  I have no regrets?

MR. WILLIAMS:  Yeah, I think that -- that is characterizing those later statements.  So I think we can --

THE COURT:  Okay.  I'm going to sustain the objection as to the no regrets.  That might be an inference with the next sentence, which I'm not affecting in 45, but I sustain the objection as to saying he has no

regrets.

MR. GROEBER:  Thank you, Your Honor.  I believe you've covered all of our objections, Your Honor.

THE COURT:  Okay.

The Government have any objections to the Presentence Report?

MR. WILLIAMS:  No, Your Honor.

THE COURT:  In the absence of objections, the Court accepts and adopts the findings of the Presentence Report as the findings of fact for purposes of sentencing with the exception of the sustained objection in Paragraph 45.

The guideline provisions are as follows.  The Total Offense Level is 37.  The Criminal History Category is VI.  The guideline range is 240 months, that is a reflection of the statutory maximum of 20 years.  The guideline range otherwise would be 360 months to life; however, it is capped at 240 months.  Supervised release, the guideline is one to three years.  The special assessment fee is $100.

Now, the Government has moved for an upward variance on the guideline for lifetime supervision.  Would someone like to address that issue?

MR. WILLIAMS:  Yes, Your Honor, I will.

MR. GROEBER:  Can we sit down, Your Honor?

THE COURT:  Yes, you may.

MR. WILLIAMS:  And Your Honor, it largely, I think, reflects our concern about the defendant's dangerousness coupled with the statutory cap of 240 months.  I intend to, at the appropriate time, Your Honor, go into what I believe is an appropriate sentence. I can certainly do that now if you'd like.

THE COURT:  No, I -- we'll get into that -- the question of supervised release, obviously, is closely related but is -- is an independent consideration.  And perhaps it just makes more sense, let's just -- perhaps what we ought to do is let's -- let's go through the balance of the sentencing, but let's not forget that that needs to be an issue we'll address at the time in which the Government discusses an appropriate sentence.  How about that?

MR. WILLIAMS:  That would work.  Thank you.

THE COURT:  Okay.  Very good.

Okay.  Mr. Groeber, I'm happy to hear from you regarding sentencing, sir.

MR. GROEBER:  Thank you, Your Honor.

THE COURT:  And for the record, I want you to know that I have -- I received this morning a letter provided to me by -- by yourself that was a letter from the -- from your client.  Is that part -- has that been

filed on the ECF?

**MR. GROEBER:** It has not. I have a hard copy for us to make it a Court's Exhibit.

**THE COURT:** I would like -- I have read the document and I would like to -- let's go ahead and mark it.

**MR. GROEBER:** Yes, Your Honor.

**THE COURT:** And we'll mark it --

**MR. GROEBER:** I've marked it Defense 1 if that's okay?

**THE COURT:** That would be fine.

(WHEREUPON, Defendant's Exhibit No. 1 was marked for identification and received into evidence.)

**MR. GROEBER:** Thank you, Your Honor.

**THE COURT:** Thank you very much. Hold on, let me -- let me look it over just one minute. (Pause)

I only had the first page filed -- submitted to me. Let me take a moment to read the rest of it.

**MR. GROEBER:** I'm sorry about that, Your Honor.

**THE COURT:** Yes. (Pause)

Thank you. I've read -- and I read the full letter. Thank you. Please proceed, Mr. Groeber.

**MR. GROEBER:** Thank you, Your Honor. Your Honor, Zak was lost to America but he does not have to be lost forever. And that's the main thrust of our argument.

It's the main reason we went so far into how this happened, how he became lost. And I want -- I will not rehash the many words that I have put in the memoranda, but I want to highlight a few things.

THE COURT: Very good.

MR. GROEBER: And Zak became lost because he was an outsider in his own community. And some of that was perceived -- perhaps overly perceived by him as he grew up. But there was some real insults and treatment to him as a young child growing up that made him feel like an outsider.

He felt --

THE COURT: Let me just say this. I have no doubt that Muslims -- that many young Muslims in America feel discrimination, and cruel and intolerant things are said to them and disrespect their faith. I don't have any doubt that is true. But very few follow such a path as this. And -- and young Muslims are not the only young people who face discrimination in their lives. And this path that was taken is very different from the path that law abiding citizens take. I mean, that -- that's the difference.

I -- I read with great care not what only you wrote but what Dr. Mulbry wrote about the defendant's early life and his experiences and observations about how

he was treated.  The difficulty I'm having, and I want you to address this, is how that then leaps into I want to kill Americans, and buying guns, training at a -- at a firing range for only one purpose, clearly, and -- and expressing -- I mean, I tried to separate.

And I look -- I don't want -- I'm telling you these things because I want you to have a chance to address them.  I tried.  I know you, you assert that the undercover agent, you don't assert that he was entrapped.  It's not a defense -- you haven't asserted --

**MR. GROEBER:**  We couldn't.

**THE COURT:**  -- as a defense entrapment.  It's not entrapment, but that he somehow lured him.  And I -- so I -- I analyzed the information we had.  Presentence Report, Dr. Mulbry's report, other documents that have been provided me.

I tried to analyze what he did himself, what he put on the social media, what he -- the actions he took, including purchasing firearms, going to -- doing training.  And the observation I have from the social media context and the actions he took, they bear a close resemblance to what he told the undercover agent.  There isn't really -- it doesn't really just seem to be inconsistent.

And he talks at one point, I'm going to -- I wish you would address this reference at -- at -- let me

find the section of the PSR.  It indicates that he had thought about committing a crime similar to Orlando in the Pulse Nightclub.  We know that -- and that's at Paragraph 41 of the Presentence Report.  And this is where the prior conduct is potentially relevant to your defense. Because in that prior conduct, he had surveilled a rifle store, a gun shop for purposes of robbing it so he could attack American military installations.

So the question is when he says these things to the undercover agent, is he merely the 18-year-old child being lured in by this manipulative adult, or are we hearing the real defendant here manifesting his intent? And note, among the things that he did on his own without the undercover agent was to post a video of himself firing an AK-47, which he posted so that his potential recruiters would know that he was facile with a firearm.  So, I mean, I want -- I want to raise that with you, so you're not under the illusion that I -- I'm a bit skeptical, because it seems to me the things in which the undercover agent was not involved, statements and conduct was remarkably consistent -- were remarkably consistent with what he told the undercover agent, not something that he was transformed by a manipulative adult.

MR. GROEBER:  Well, Your Honor, I will address -- I would like to address the Amer -- the comment

about fighting against Americans.  You mentioned that one specifically.  It's in the Presentence Report.

THE COURT:  Well, there are multiple ones, right?  There's one about, I want to attack Americans.  I want to kill Americans abroad.  I'm willing to kill Americans here.  If I get caught -- and then the statement about -- that appears to relate to almost leaving his car to go to a location.

MR. GROEBER:  And -- and the, the resp -- the answer to that is that Zak's statements are responses to challenges by the undercover agents.  For example, on February 24th, the UCE, this is the second agent involved with Zak online, they are discussing what clothes Zak is going to wear for travel.  And the agent said last night, I heard that the US troops are now helping the Egypt army so you may get a chance to engage them.  So it's an offer, it's a challenge to him.  How will you react?

THE COURT:  They may be alerting him he -- that this is not going to be fighting the Assad regime, you may encounter Americans.

MR. GROEBER:  Right.

THE COURT:  Which, by the way, he criticizes another potential recruit for unwill -- being unwilling to kill Americans.  He was being recruited, that's --

MR. GROEBER:  In response to --

THE COURT:  I --

MR. GROEBER:  -- the Government agent prodding and -- and provoking him.  And the -- the short answer --

THE COURT:  Is he provoking him or merely having him explain in a -- in a more detailed way his personal views?  I mean, Mr. Abdin does appear to be very well-informed about what's going on in Syria.  He's following it very closely.  I understand that.  He's got family there.  He feels that his brethren are being attacked.  I understand that.  So he's not an uninformed person.  He knows Americans are there.  I mean, there's no secret to that, right?

MR. GROEBER:  Right.

THE COURT:  And so one way to say is, you know, the -- mentioning to see if he'll give a response.  And he does.  He doesn't -- he doesn't -- I don't see it as luring him to do it.  But -- but he makes it clear he's -- he's fully -- he says at one point I want to kill Americans, something I want to do.  And he criticizes someone who is unwilling to do that and who backs out of being a recruit because he's unwilling to kill Americans.

MR. GROEBER:  And that, that action by the Government agent -- and we -- I can give you a list and some examples of others -- is a challenge.  And this is a tactic that ISIS uses as well to challenge people to see

if they're --

THE COURT:  Committed.

MR. GROEBER:  -- committed.  And -- and Zak's response to that is he wants to go over there.  At this point, this is -- this is a month and a half after he started -- started conversations with the Government agents.  And so they are -- they are challenging him, challenging to see what is his response.  And his response is to -- to take the bait, but to puff it up so that they will believe that he's real and will help him go over there.

THE COURT:  Well, you're telling me I shouldn't believe it, that what your client said I really shouldn't believe.

MR. GROEBER:  In regards to the actions about attacks in the United States, yes.

THE COURT:  And you think he's puffing?

MR. GROEBER:  Yes.  And -- and he is prepared to answer your questions about those statements, Your Honor.

THE COURT:  Well, he's bought fire -- multiple firearms, including an AK-47, correct?

MR. GROEBER:  Yes, Your Honor.  It was an SKS, actually.

THE COURT:  SKS.  Thank you.  SKS.

MR. GROEBER:  A similar -- similar weapon.

THE COURT:  He's bought an SKS, an automatic assault firearm, correct?

MR. GROEBER:  Semi-automatic.

THE COURT:  Semi-automatic firearm -- assault weapon, correct?

MR. GROEBER:  Yes.

THE COURT:  He can't take it to Syria with him?

MR. GROEBER:  No.

THE COURT:  So what's his purpose?

MR. GROEBER:  Well, what he was doing during that time is, is -- first of all, it's -- I mean, he was allowed to do that.  He was allowed to possess a firearm.  He bought that firearm from a veteran.

THE COURT:  He's not charged with unlawfully possessing a firearm.

MR. GROEBER:  Correct.

THE COURT:  He's -- he's -- but this --

MR. GROEBER:  And --

THE COURT:  -- all goes to his state of mind.  I mean --

MR. GROEBER:  But -- but --

THE COURT:  -- he's -- he can go buy all the firearms he wants.  Obviously, in the United States, we allow that.  But, you know, when you're talking about attacking Americans and, if necessary, in the United

States, and you've gone to -- to purchase an automatic weapon, a semi-automatic weapon, assault weapon, and you train with it, and you announce I'm willing to use it if necessary here, you know, you're telling me I shouldn't believe him.  It's mere puffery.  It's -- if -- if he has simply talked a big game and -- and not taken action in support of it, well, perhaps that could be an argument to be made and be something to be weighed.  But when you take an action in furtherance of that, of that belief by purchasing a firearm you could not use overseas, you can't take it with you, so you couldn't get it out of the country.

**MR. GROEBER:**  Right.  And he sold it.  He -- it's one thing for him, Your Honor -- and I don't think we could --

**THE COURT:**  He sold it so he could go buy a ticket because he decided he'd rather make his efforts overseas.  I mean --

**MR. GROEBER:**  His -- his whole effort from the beginning was to be overseas.  That's the -- that's the distinction that --

**THE COURT:**  But he recognized he might get caught.  I mean, he's under -- he knows he's under -- under scrutiny by the FBI.  They met with him.  He knows that.  And he says at one point, if I -- listen, if I get

caught, I'm willing to do what I can do here in the United States.

MR. GROEBER:  After --

THE COURT:  And he tells Dr. Mulbry the same thing.  He says, you know, I was -- I'm willing -- I'm prepared to do something if I had to in the United States. I -- I mean, what we're talking about is was he -- I mean, you're basically making the entrapment argument that legally isn't permissible.  Of course, you can argue some variation of it for mitigation.  It's just not -- it doesn't seem very well supported by the evidence we have independent of the interaction of the undercover agents and -- and the defendant.

MR. GROEBER:  And -- and I think there's two separate questions.  Both are relevant for sentencing. One is, did he take actions that were training to be a soldier fighting overseas?

THE COURT:  Clearly, he was.

MR. GROEBER:  Yes.

THE COURT:  He clearly was doing that.

MR. GROEBER:  Yes.  And the question -- the second question is, was he -- did he mean what he said about an attack here?  And --

THE COURT:  You think I shouldn't believe you?

MR. GROEBER:  I -- again, he's willing to -- to

answer your questions about that, Your Honor, about his intentions.

THE COURT:  I almost got in my car and left for a location.  What is that all about?  Paragraph 41.

MR. GROEBER:  And --

THE COURT:  I almost got in my car and left for a location.

MR. GROEBER:  This -- I -- I mean, there -- those statements are frightening.

THE COURT:  They're referencing -- you have not objected to Paragraph 41.  It says -- this was an apparent reference to the terrorist attacks by Omar Mateen --

MR. GROEBER:  Yes.

THE COURT:  -- at the Pulse Nightclub.  I mean, that's not an objection.  I take that as a finding of fact.  So, yes, it could be that -- that a young man could be manipulated by an older experienced law enforcement officer to -- to do puffery.  But he's -- he's buying firearms that have no use in Syria.  He can't take them with him.  I could see there could be some element of training benefit from it.  But he owns them.

And -- and he's contemplated -- and there's another statement in here, we can find it, where he makes the statement that if I get caught, I'm prepared to do the fight right here.  Right?

MR. GROEBER: Yes, Your Honor.

THE COURT: Okay.

MR. GROEBER: And what --

THE COURT: I interrupted you. You can continue.

MR. GROEBER: It is important for the Court to -- to read the -- the whole context within these chats. Okay? So that statement that you just quoted in Paragraph 41 is made on March 16th.

THE COURT: Yes, sir.

MR. GROEBER: The SKS rifle was sold on March 2nd.

THE COURT: Okay.

MR. GROEBER: So he's not in possession of a rifle or anything that could do anything in that -- at that time --

THE COURT: Did he have any firearms left?

MR. GROEBER: He did have one handgun at that time.

THE COURT: And he could have gone to purchase another firearm if he wished?

MR. GROEBER: On March --

THE COURT: Well, we know when he made the statement. When did he almost go -- when did he get in his car and went -- go to the location? When did that

happen?  And what was the location?

MR. GROEBER:  There wasn't one, Your Honor.

THE COURT:  I almost got in my car and left for a location.

MR. GROEBER:  Your Honor, when -- when the Pulse -- he's talking about when the Pulse Nightclub shooting happened.

THE COURT:  Which just happened the year before.

MR. GROEBER:  And he was on parole and being heavily monitored during that time.  He had no weapons at that time.  There is no evidence --

THE COURT:  He was paroled into January.

MR. GROEBER:  But --

THE COURT:  And he immediately commences social media contact and he purchases multiple firearms.

MR. GROEBER:  Your Honor, the Government -- if --

THE COURT:  When does he go to the location? When is --

MR. GROEBER:  He doesn't go to a location.

THE COURT:  I almost got in my car.  When was that?  What was the date of that, that I almost got in my car and left for a location?

MR. GROEBER:  He didn't.  He said that, so we can't object that he said that.  But he did not do that.

And that's --

THE COURT:  He did not do what?  Did he have a plan?

MR. GROEBER:  He did not have a plan.  He didn't almost go to a location.  He didn't plan to do any kind of shooting.

THE COURT:  He's just bragging about wanting to.

MR. GROEBER:  Yes.  And he's doing it in response to these statements by the undercover agent. March -- or February 21st, Many westerners become like chicken when they come over here to fight.  February 24th, You might face the United States Army.  March 5th, If you're scared, you can stop.  March 10th, Let me know if you don't want to be a team leader.  March 10th again, he tells Zak he thought he was an undercover agent. March 14th, two days before this statement that the Court has a lot of concern about, The brother from Chicago, he became like a chicken.  Same day, Some people's faith is weak.  March -- again March 17th, I believe, If you're worried, you can stay.  These are challenges to Zak.  He wants this person, the handler for ISIS, who he thinks is --

THE COURT:  To believe him.

MR. GROEBER:  To -- he wants -- yes, he wants the handler to believe him so that he will help him go and

fight with ISIS in Syria.  That is the context of the statement that he gives on March 17th.

THE COURT:  Well, is he prepared to kill Americans in Syria?

MR. GROEBER:  I think the answer is that he was prepared to fight against anyone in Syria, including American soldiers.  Yes.  Yes, sir.

THE COURT:  So he was prepared to kill American soldiers?

MR. GROEBER:  In -- in the context of war, yes, Your Honor.  And this whole thing starts when he's 14 and 15.

THE COURT:  I told you I think that's -- that the age issue is a relevant issue that I want to consider. February 19, If something goes wrong, then I will continue my struggle here in the United States.  He wants to go to Syria but he says if something goes wrong.  Paragraph 23.

MR. GROEBER:  This is after March 13th -- excuse me, February 13th and February 14th, where the CHS is saying similar things -- or we have redactions, but the FBI has confirmed that this is the person speaking about and showing bona fides, showing their bona fides.

THE COURT:  So both -- they're huffing at each other?

MR. GROEBER:  Yes, Your Honor.  And -- and Zak,

who is not the savviest person, thinks that this is what to say.  He thinks he's testing this person by saying what he's saying.  And in the end, he's making himself look worse and terrible.  And so he -- and he's getting caught.

THE COURT:  Well, it's --

MR. GROEBER:  He thinks he's smoking out --

THE COURT:  It's pretty bad to be planning to go kill Americans in Syria, all by itself.

MR. GROEBER:  It is, yeah.  It is pretty bad to leave one's own country to go fight for a country like -- not even a country, to fight for a set of -- a gang, which is basically what ISIS is, and to be willing to do that.  And that is terrible and he admits to that.  And we've discussed at length how he got to that point.

THE COURT:  I mean, that's -- I hear what you're saying about all this.  It's just his conduct is very consistent with his statements.  But I -- but I hear what you're saying, that each are huffing at each other.

MR. GROEBER:  And -- and this is -- it can't be removed from what happened and what he saw when he was 14.  I mean, that's why we produced to Your Honor, you know, that there's -- um, not the Holy Warriors article, but the -- sorry.  Let me -- it was attached to Dr. Mulbry's report and it shows a lot of the ISIS propaganda specifically.

THE COURT:  Right.

MR. GROEBER:  The Hypnotic Power of ISIS Imagery.

THE COURT:  Listen, I --

MR. GROEBER:  And --

THE COURT:  Listen, you know I know from other cases the effect the internet can have on -- I'll just call it internet toxicity --

MR. GROEBER:  That's --

THE COURT:  A dangerous -- it's effect on young men.  I've been -- I've been through this.  Okay?  I'm not new to this.  But it doesn't -- we know here in Charleston that there are really serious consequences to this toxicity.  It's not a --

MR. GROEBER:  Absolutely.

THE COURT:  -- it's not a -- something in isolation that we can just say, oh, this was terrible.  These folks just didn't act.  And young men and women all across the world are responding to this propaganda --

MR. GROEBER:  Right.

THE COURT:  -- and committing acts in their own countries and in other countries that are -- that are -- they're pretty horrible.  And it doesn't make them less dangerous that they were induced.  You know, people have made a lot of studies of -- of horrendous conduct by

nations under unwise leadership, right?  Dangerous leadership.  Complicity with evil.  And they're still responsible for their conduct.

MR. GROEBER:  And he is responsible for his conduct.  So this is not -- you know, Zak knows he's going to prison.  He deserves to go to prison.  But the question is --

THE COURT:  You know, he's gotten a -- quite a break, frankly, by the statutory maximum.  I mean, his guideline would otherwise be 360 to life.  Now, I know you want less than the maximum.  I'm just saying --

MR. GROEBER:  Yes.

THE COURT:  -- you and I both know we've had many cases like this where the guidelines are above the statutory maximum.  And that's just tough; I mean, tough for the Government that -- as most of the sentence --

MR. GROEBER:  It's usually tough for my clients, but --

THE COURT:  Yeah, well -- well, you mean they got caught up at the top of the --

MR. GROEBER:  Yeah.

THE COURT:  -- of the only guideline.  I hear you on that.

MR. GROEBER:  And -- and, you know, we -- we discussed in our memo the terrorism enhancement and its

effect --

THE COURT: By the way, I thought your memo -- two -- two memos, I thought you did a fine job on the memos.

MR. GROEBER: Thank you. And so I think that reading, first of all, a lot of the cases around the country, there is a -- a sort of breadth of involvement. And I know the Court's struggling with where does Zak fit in.

THE COURT: Of course, you didn't give me all the cases. You gave me the ones at one end of the --

MR. GROEBER: And they gave you the ones at the other.

THE COURT: They did. They -- everybody's -- somehow -- and the truth is supposed to be somewhere in the middle.

MR. GROEBER: I gave you a broader range than the Government did though.

THE COURT: Yeah? Well, okay, you did.

MR. GROEBER: I do want to talk about Zak and his family relationship for a little bit, Your Honor.

THE COURT: Yes.

MR. GROEBER: Here with him is his mom and his sister. I know that we submitted a letter, but they are here, and a family friend for Zak, to show him some

support, to show him that they love him.

THE COURT:  You know, every time I sentence someone to prison, I'm sentencing the family to prison as well.  I'm very conscious of that.  And I'm very aware from the interview of -- of Mr. Abdin's mother, how heartbroken she is about his direction.  That she is a very loyal citizen of this country, and his dad was as well, and did not agree with his beliefs about ISIS.  That they were horrified by it.  It was inconsistent with their view of Islam.  I get all of that.

MR. GROEBER:  And -- and their view of Zak.

THE COURT:  And their view of him.  And I'm -- I'm sure they're heartbroken by this.

MR. GROEBER:  I will tell you that his younger sister described the house as empty.  His mom says it feels like there's a hole in the home.  And they describe Zak as a caregiver, a helper.  He's actively involved -- he was actively involved in their lives and in helping them.  Of course --

THE COURT:  And I read in his letter he says, you know, I want to be home to help my family.  Obviously, his dad's gone.  I mean, there's -- there's a place -- I hear all that.

MR. GROEBER:  And that -- and that's a real -- that's the real Zak, Your Honor.  And his family wants you

to know that.  That's the Zak they know and love.  And they are upset at him that he was hiding this from them.  And they wish he hadn't done that.  And they're upset that they weren't notified.  And --

THE COURT:  Well, they had some signal, though.  They -- he -- he wasn't -- I mean --

MR. GROEBER:  Well, he --

THE COURT:  -- obviously, he has this prior episode where he goes to --

MR. GROEBER:  Sure --

THE COURT:  This is a young man who up to this point had been a good student.  He had never been in trouble with the law.  And suddenly he's going to the juvenile justice system for what could easily have been prosecuted in other places as an adult.  And so they -- they knew, at least they had some clue that he --

MR. GROEBER:  Sure.

THE COURT:  -- was off the reservation, so to say.

MR. GROEBER:  Well, they didn't know --

THE COURT:  The extent of it.

MR. GROEBER:  -- in January.  They had no idea that this was going on January, February, and March of 2017.

THE COURT:  I will tell you that the sequence

the Government lays out, it's actually in the PSR, where he's literally five minutes from his parole ending and he's starting his social -- he's starting reaching out to ISIS within, literally -- I mean, he doesn't even wait until midnight to do it.  Which, again, goes to what is his intent?  I don't think we're -- we have any real disagreement that his intent is to go to Syria and, if necessary, to kill Americans.  Pretty serious all by itself.

I think where there may be some difference between you and the Government is on whether he represented a clear and present danger right here in the United States.  And there's certainly evidence that would tend to corroborate that view.

MR. GROEBER:  Your Honor, more about his family.  His -- you know, it's sort of ironic that he has now lost the thing that's most important to him by being attracted to, at least initially, ISIS for -- for this kind of effect that the Syrian government was having on his family in Syria.  And I think it is important that you know that they haven't given up to him -- on him.  And they've been, obviously -- he's talking with his mom.  Their letter discusses what they think is his maturity and his reflectiveness about this over the last couple of years.  And he's not lost to them.  They are still here for him.

Karen E. Martin, RMR, CRR
US District Court
District of South Carolina

They still love him.  They will still help him when he gets out.

You know, Ms. Penn and I talked.  We see his mom at the jail almost every time we are there.  So she's regularly seeing him.  His sisters are doing really well.  They're going to school.  They have the opportunity for higher education.  And his mother especially wanted to ask and to give a plea for mercy for him.

THE COURT:  I'm glad to hear from anyone who wishes to speak.

MR. GROEBER:  I understand.  She -- she is not -- does not wish to speak, is -- doesn't speak English terribly well, so that is the main reason.

THE COURT:  I understand.

MR. GROEBER:  But they really want Zak to get the help that he needs.  And it's our belief that you can fashion a sentence that will get him that help.  And that's what we're asking you to do.  And that -- I know Zak would like to address Your Honor.

THE COURT:  Yes, sir.

Glad to they're from you, Mr. Abdin.

THE DEFENDANT:  First of all, I would like to thank you for reading my letter.  I greatly appreciate your time.  I know that I'm going to be spending some time in prison.  And I plan on using this time to think and

learn as much as I can, so that when I get back into society, God willing, I will be able to help my family. I'm truly regretful that I've let down my family by making this decision.  I've also let down my father by abandoning his words, when he commanded me to look after them.

This is truly the worst mistake I made as a teenager.  I now realize my teenage years are over and now it's time for me to make wiser decisions.  This is a lesson learned and it will never happen again.

And I wanted to tell my mom that I'm sorry for letting you down.  And it's not your fault.  And I love you.

That's it.

**THE COURT:**  You know, Mr. Abdin, one of the opportunities you might want to consider with the help of your family is there are correspondence courses for college while you're in prison.  To my continuing frustration, the Bureau of Prisons does not offer college courses for prisoners.  I think they should.  They do a GED, but I believe you already have a GED, don't you, sir?

**THE DEFENDANT:**  Yes, sir.

**THE COURT:**  But you can take correspondence courses, and I would urge you to do that.  Also, you have a skill, auto mechanics -- mechanical.  When you -- when you arrive in prison, if you indicate that this is

something -- you want to be a contributor.  You don't want to be trouble.  You don't want to be a problem.  You want to be part of building a new life.  I suspect you could be become a very valuable member of the team there.  And it will put you around other people.

There -- I often say there are two classes of people in prison.  One of them who are trying to turn their lives around.  And the other one trying to figure out how they're going to commit the next crime when they get out.  You want to be with the first group, not the second group.

And because you have this skill, and which I think you could probably improve your skills while you're -- while you're in prison.  That's a very valuable skill which you can make a living when you get out as well as other skills.  You watched your dad run a restaurant.  You have some idea about how to do that.

So I'm hoping you'll take advantage of this time to continue your -- your journey.

Anything further?

MR. GROEBER:  Judge, just briefly, to mention we requested downward departures based upon youth, also based upon his time in solitary for the last 27 months.  And so we just would remind the Court about those and the bases for those requests.

THE COURT: Yes.

MR. GROEBER: And that's all for now. I'm sure I'll have a response to the Government.

THE COURT: I will give you that. I will afford you that opportunity.

MR. GROEBER: Thank you, Your Honor.

THE COURT: From the Government?

MR. WILLIAMS: Thank you, Your Honor. Your Honor, in support of our request for what is a guideline sentence, a 240-month sentence, followed by a lifetime term of supervised release, I want to make I think probably two, maybe three main points.

One, Your Honor, is I don't see anywhere in his briefing, in his statement, and I think most importantly, in the recent letter the defendant has provided a renouncement of ISIS. I don't see -- he tells his mother he's happy after he's arrested; that he's not sorry. But more importantly, nowhere do I see where he says that ISIS is a terrorist organization that does horrible things. In fact, we have seen him embrace those horrible things, volunteer to be the person who beheads hostages on camera, to kill Americans, to kill soldiers. So Your Honor, it's -- it's troubling that he hasn't done that.

I think if you couple that with what I see are his positive statements regarding ISIS -- and again, I'm

not going to go through all of the defendant's briefing. But the letter he provided Your Honor, in the context of not denouncing ISIS, the closest he comes to denouncement is he says, I am making this change out of my own free will because I feel like it's about time I should start to focus on my family. And I am starting to doubt the group for its brutal tactics and unnecessary killings. I feel like this was written recently, Your Honor. The furthest he has come is to start to doubt the tactics of ISIS, which is a -- a horrific terrorist organization.

And, Your Honor, his --

**THE COURT:** There's a statement called a jailhouse conversion.

**MR. WILLIAMS:** And it's not much of one, Your Honor.

**THE COURT:** Right. What I'm -- well, you know, and that's a cynical term, as you know. He also says on the first page, I did not mean everything that I said. Well, okay.

**MR. WILLIAMS:** Yeah, and it -- it begs what he did mean.

**THE COURT:** What did he -- what did he mean?

**MR. WILLIAMS:** But there wasn't much --

**THE COURT:** You know, I -- I tried to separate out, I just carved up all the evidence that involved

matters inconsistent with this encounter with the undercover officer. I lined all those up. Then I took all the things he did on social media, his actions in purchasing multiple firearms, his actions in training.

And then I considered, you know, his conduct over the whole course of time in terms of whether it was consistent or inconsistent with the -- comparing those to the statements. And what I saw was a lot of consistency. I didn't really see any deviation.

And I -- I wanted to read the letter. I had only gotten the first page, so I wanted to read the letter to see if there was a -- a focused renunciation of the methods and brutality of ISIS.

But it wasn't a secret. I mean, he had seen the videos of the -- of the murders and so forth. He says that. I think it was in Dr. Mulbry's interview. He had seen those. He knew what he -- he knew what he was getting.

I mean, he's young. The key issue here is is how much do we weigh the actions of an 18-year-old young man, right? I mean, we're really talking literally on the 18th birthday is what -- the conduct we're talking about here, moments before his 18th birthday, and then his 18th --

MR. WILLIAMS: And then my response --

THE COURT: How -- how do we weigh that in terms of what an appropriate sentence is?

MR. WILLIAMS: And part of my response here, Your Honor, is -- sorry, I didn't mean to interrupt.

THE COURT: No, no, no. I'm just saying that, to me, is what -- what does that tell us? And what -- what weight should I give it? And I was candid with Mr. Groeber that he's gotten quite a break just because of the statutory maximum.

MR. WILLIAMS: And ultimately, Your Honor, I will argue that that break takes into account his age. But I'll also argue now that these letters indicate a future dangerousness that is created by a true lack of under -- a lack of belief that what he thought was right is actually wrong. He does not renounce ISIS. In fact, if you look at this letter, he spends paragraphs talking about what he felt were the good things -- he calls it ISIL -- that ISIS did. That's in stark contrast to his ability --

THE COURT: Right. Providing services and all that, yeah.

MR. WILLIAMS: Right. Which, you know, Your Honor, again, I think the fact that he gives paragraphs talking about them providing services, food, the things he perceives as good, are not in any way weighed by things

Karen E. Martin, RMR, CRR
US District Court
District of South Carolina

that he thinks are negative.  In fact, he says he is still sort of up in the air on deciding that.

So my first argument, Your Honor, is that his lack of renouncement coupled with his positive references to ISIS, the absence of any negative attributes for ISIS in his statements is an indication that he is a significant future danger.

The other thing I would add to that, Your Honor, is he also blames, and I think in some very real ways feels aggrieved by, the American Government.  And Your Honor, this is similar to the -- Your Honor's identified the Omar Mateen concern.  This is consistent with an individual who is a homegrown violent extremist, an individual who feels aggrieved by his Government, has a -- even by his own argument a sense of lack of identity that he fulfills through a terrorist organization and is preparing to commit terrorist crimes in this country and abroad.  And we can make distinctions about the timing on that.  But what is clear is he was planning to commit a terrorist attack and found a better offer through the FBI.  And he blames them.  They prevented that attack.

THE COURT:  I find the whole blaming of the undercover thing completely unpersuasive.  I just --

MR. WILLIAMS:  And I appreciate that, Your Honor.  I feel like I have to say that they prevented an

attack in this case.  And the agent's in the courtroom. And he has been literally blamed by the defendant for preventing that attack.  And Your Honor, they're --

THE COURT:  Well, give him a -- give him a little bit of space here, I'm talking about the defense. They don't have much to work with here.

MR. WILLIAMS:  Well, I get that, Your Honor. And -- but I also -- I also see what they said about these case agents.  And I have to respond to that in some way.

THE COURT:  And I think the agents conducted themselves in a professional manner.  I have that view. And I think that to the extent they made statements, they wanted to see whether this guy was for real.  And if he was just puffing, you know, that that made him -- suggests to them he was less dangerous than perhaps -- and what he -- what he kept telling them was what they already suspected, which was that he -- he meant what he said.  I mean, he's out there doing stuff.  He's -- I mean, you know, this goes -- does he really mean it?  And this is what -- and I appreciated why Mr. Groeber wanted to not talk about the pre-- the prior conviction.  And it's only relevant to whether he means what he says today.  But he's out there surveilling a -- a gun shop to rob it so he can attack a military installation.  So when he says I'm willing to kill Americans, I'm thinking about, I almost

got in my car.  I think the evidence suggests we ought to believe him.

MR. WILLIAMS:  And Your Honor, I would -- I would add to that.  I was having a discussion with the agent.  There was an indication in his -- the defendant's discussions with the investigators on February 3rd of 2017, where he sends an image of a nightclub in the United States to the sources in the case.  And in that discussion said, I'm thinking we can go on vacation and have a good time.  I'm thinking the drinks are on me, you know what I mean?  Bring your family and I'll bring mine.  And we can enjoy this night if you need a vacation on your days off.  A lot of music and good times to relax, you know, I'm going to dance like crazy and enjoy myself.

THE COURT:  You think that's all spoof.

MR. WILLIAMS:  I think that's related to his, I was about to go to the place, Your Honor, as to those questions.  There's some --

THE COURT:  I'm not sure of that, but okay.  I hear you.

MR. WILLIAMS:  I'm trying to provide Your Honor with the -- some evidence we have of possible planning is all.  And I think --

THE COURT:  I think his buying the guns is to me, like, pretty compelling evidence.  He could rent a

firearm at the gun shop, right, where he was using the firing range?

**MR. WILLIAMS:** Right, Your Honor.

**THE COURT:** He didn't need to purchase one.

**MR. WILLIAMS:** And I think probably --

**THE COURT:** Am I right about that?

**MR. WILLIAMS:** Yes, Your Honor.

**THE COURT:** So he purchased it. What -- why is he purchasing? I mean, he has very limited resources. Why is he purchasing these firearms?

**MR. WILLIAMS:** And his limited resources, I think, are telling, Your Honor. His first plan was to commit a domestic attack, if necessary. When he was able to find an international connection, he sold those guns to further his plan and buy a plane ticket. They didn't buy that ticket for him. He went to the counter and he bought it. Your Honor, he walked up to the gate.

So it is completely consistent in his plan of committing a terrorist attack to commit that domestically until he has an external connection. He found a better plan. And frankly, they disrupted and diffused that, that first -- what I believe is a clear plan of attack designed on what Omar Mateen did in Orlando.

So, Your Honor, I would suggest that's consistent with that language, and I'm not going to go

over it again, but seeing the good in ISIS, seeing the bad in the Government and blaming the Government, having the grievance against the Government.

THE COURT:  Well, there are a lot of people who -- who may simplified -- who may be hostile to the Government.  They're entitled in the United States to disagree with their Government.  And there are people who may feel that -- that they have been wronged in this country or that their brethren are wronged in another country.  It doesn't -- the conduct is not to engage in terrorism against it.  I mean, there are ways in an orderly society this kind of -- that one can be heard and voice without committing terrorism.

MR. WILLIAMS:  And certainly, Your Honor, he could have chosen other opposition groups in Syria apart from ISIS.  I mean, there are certainly earmarks in this case that it was in fact violence that was his goal, it was killing.  He remarked in one comment that in the worst case scenario he could repair cars to help ISIS.  Clearly, he's bent on violence and making that statement.

Your Honor, I'll sort of sum up my argument.  I think you've covered the Omar Mateen concern.  But what I'll say, Your Honor, is that there is a strong indication I think to the Government that this is a homegrown violent extremist who was diffused, who was stopped.  We see these

cases after the fact. And we see these same factors, a person searching for identity who latches on to a belief, believes in it, and makes every effort to fulfill it.

THE COURT: Does that sound familiar to you, Mr. Williams?

MR. WILLIAMS: Your Honor, you know it does. It's not just domestic terrorism, but it's Omar Mateen. And, frankly, Your Honor, to get to the age question, I'm not sure there's a big distinction with these type of cases between 21, 20 --

THE COURT: I mean, just so we -- we ought to just say, because you and I are communicating with each other. Mr. Williams was one of the lead counsel in the Dylann Roof case. And we saw a lot of this very same evidence of a young man radicalized on the internet and who committed heinous crimes.

MR. WILLIAMS: And, frankly, who a lot of people did not take seriously at the time and had --

THE COURT: Correct. And he -- that he meant what he said.

MR. WILLIAMS: And so, Your Honor, I see in his letter the earmarks of what I would consider otherwise a manifesto from a homegrown violent extremist. And understanding it took a certain path, but at some level distinctions between ISIS and white supremacy, and -- you

52

know, different people have different things they latch on to.  But it does not change the extremism and the terroristic aspects of -- of what his intent was.

And I think the Omar Mateen comparison is poignant.  I mean, he was talking about clubs to attack. He found a better option to go abroad.  And he did literally everything he could, selling his guns, to get a plane ticket, trading one plan for the other.  And in that sense, Your Honor, I think that goes to literally his future dangerousness.

I want to speak quickly to the other background, Your Honor, and why there's certainly more evidence of his future dangerousness.  He did have a break, Your Honor. And I'm not talking about the guidelines in this case. I'm talking about where he was incarcerated in juvenile detention.

**THE COURT:**  Which is a huge break.  Could have been prosecuted as an adult.

**MR. WILLIAMS:**  He had every chance to turn himself around.  He did not take advantage of those and --

**THE COURT:**  And then the visit from the FBI in 2016.  They're kind of like saying you need to kind of not do this.  We're watching.

**MR. WILLIAMS:**  Understanding they cannot disclose their ongoing investigation.  If any of us is

brought into an FBI anti-terrorism agent's office at the recommendation of law enforcement, and he tells you specifically about the ISIS threat while you are communicating with someone about those threats and you don't understand that, Your Honor, you are not going to change your mind as a result of intervention. And that's what he complains of. Nobody intervened. Well, it's pretty clear he wasn't going to hear that message.

So, Your Honor, I feel like he was, one, disrupted through his first attempt. He was put in the juvenile facility. He was on supervised -- he was on parole --

THE COURT: Parole.

MR. WILLIAMS: -- in the state system. Had a good, by all accounts, a good parole officer who he communicated with. Yet behind that, as soon as he was almost done, he goes right back online. And when confronted with that --

THE COURT: Literally within minutes.

MR. WILLIAMS: Yes, as soon as he can. And he's relatively smart about it, Your Honor. I mean, I feel like he understands that he has to bide his time. But when he's confronted by the FBI and given, frankly, a pretty direct warning, he does not abide by that and continues with his plan. So I think that shows the

dedication he has to his extremism.  And I would say, Your Honor, given that, it does warrant a 240-month sentence.

Addressing your question about youth, Your Honor, I think that takes it into account.  I think if there were not a statutory cap in this case, or if there were other charges where you could stack the sentence, there may be a different argument from the Government.  I don't know what that would be.  I'm sure it would be well discussed.

**THE COURT:**  Well, the cap is the cap.  Talk to me about supervised release.

**MR. WILLIAMS:**  Well, Your Honor, I think that's a surrogate for, frankly, my opinion what would otherwise be a guideline imprisonment sentence.  I think he has to be supervised at a very high level even after doing his prison time.  And by that, I'm suggesting 240 months is the highest sentence possible.  I don't suspect it's sufficient -- or I'm not comfortable with it being a complete sense of security when he's released.

So I would suggest Your Honor do everything you can to keep the public safe from him.  The stakes are simply too high, Your Honor.  The indications in this case of an international domestic terrorism attack, or a domestic one such as Omar Mateen, is simply too dangerous.  And he represents that danger in a very real way.  So I

think the only way to keep the public safe is to impose what I see as a maximum sentence, 240 months, and then a lifetime of supervised release.

THE COURT:  Mr. Groeber, glad to hear from you, sir, on reply.

MR. GROEBER:  Thank you, Your Honor, could I have a moment?

(WHEREUPON, the defense attorney spoke privately with the defendant.)

MR. GROEBER:  Your Honor, just a couple of thoughts.  It is a bigger problem that we have to figure out as a country, which is how are we going to stop and help people like Zak who have been radicalized by ISIS or by something else?  And I -- we believe that the Court has options other than 20 years to do that.  And in fact, 20 years may be something that actually encourages -- if he's placed in the wrong spot --

THE COURT:  That could happen if he got one day.

MR. GROEBER:  That's true -- well, I'm not sure about that, Your Honor, but --

THE COURT:  What, any short period of time --

MR. GROEBER:  Right.

THE COURT:  -- he could be exposed to people. Prisons are -- that's why I was encouraging him, A, to improve -- increase -- continue education, because I think

Karen E. Martin, RMR, CRR
US District Court
District of South Carolina

education can help you mature and understand things.  And secondly, to try to associate himself while incarcerated with people who are trying, like he tells me, to turn his life around.

MR. GROEBER:  Yes.  And his letter is honest. And it is open about how he feels.  And it is -- and I think he deserves credit for that, that he is trying, and working through, and trying to be better.  And what I ask you know, what do we want -- if Zak were our kids, what would we want to happen?  What would we -- how would we want him to be helped?

THE COURT:  Well, I don't sentence my children. I have to --

MR. GROEBER:  Well, I understand that.

THE COURT:  I have to maintain the rule of law, have a detachment, listen to everything, and make a ruling.  But I don't think the proper standard is what I would want for my own child.

MR. GROEBER:  No.

THE COURT:  But I wouldn't sentence my child.

MR. GROEBER:  But I think that that is a way to think about how do we want him -- how can we help him be a better citizen?  And a maximum sentence in this case, we don't believe, achieves that.  And because of a lot of the factors that led to him being here, which specifically his

youth and his lack of experience in the broader world, he was a very isolated individual within his family in Syria. And the only place he's been, other than those two places, is Boston once.

And so we ask that you consider that for him as you fashion a sentence and think that through an extended term of supervised release, the public can be kept safe. And he can be monitored and he can turn his life around. Thank you.

THE COURT:  Do you object to lifetime supervision?

MR. GROEBER:  I would object to lifetime supervision unless the Court agrees that the statute allows him to petition, if he has shown that he's rehabilitated.  And I think that --

THE COURT:  That's always true.

MR. GROEBER:  That's fine, if the Court states that.  I mean, I agree.  I think that's what the law is.

THE COURT:  That's what the law is.  I mean, if I became persuaded that -- or it may be my successor would be persuaded, yes, he would be entitled to -- we modify supervised release terms all the time.

MR. GROEBER:  With that, Your Honor, no, we don't object to lifetime supervised release because of his ability to prove that he has been reformed.

THE COURT:  Okay.

MR. GROEBER:  Thank you.

THE COURT:  Let me set forth the sentence and then I'm going to state more fully on the record the basis of the Court's sentence in this matter.

Having calculated and considered the advisory sentencing guidelines and having also considered the relevant statutory sentencing factors contained in 18, United States Code, Section 3553(a), it is the Judgment of the Court that the defendant, Zakaryia Abdin, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 240 months.  It appears the defendant does not have the ability to pay a fine, therefore the fine is waived.  The defendant shall pay the mandatory $100 special assessment fee.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of life. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

While on supervised release, the defendant shall comply with the mandatory and standard conditions of supervision outlined in 18, United States Code, 3583(d). The defendant shall also comply with the following special

conditions for the reasons set forth in the Presentence Report, which has previously been adopted by the Court as the findings of fact for purposes of sentencing.

Number one, the defendant shall participate in a program of mental health counseling and/or treatment as deemed necessary by the United States Probation Officer until such time as the defendant's release from the program is approved by the United States Probation Officer.

Number two, you must allow the Probation Officer to install -- defendant must allow the Probation Officer to install computer monitoring software on any computer that he uses.

Third, to ensure compliance with the computer monitoring condition, the defendant must allow the probation officer to conduct initial and periodic unannounced searches of any computers or other electronic communications or data storage devices or media subject to computer monitoring.  These searches shall be conducted with the purpose to determine whether the computer contains any prohibited data prior to the installation of the monitoring software, to determine whether the monitoring software is functioning effectively after its installation, and to determine whether there has been attempts to circumvent the monitoring software after its

installation.  The defendant must warn any other people who use the computers that the computers may be subject to searches pursuant to this condition.

Number 4, the defendant shall contribute to the costs of any treatment, drug testing, and/or location monitoring not to exceed an amount determined reasonable by the court-approved United States Court Probation Office's Sliding Scale for Services and shall cooperate in securing any applicable third-party payment such as insurance or medicaid.

Now, in imposing this guideline sentence, I have considered all the factors under 18, United States Code, 3553(a), as well as all the factors under the sentencing guidelines, including the factor of age.  The 3553(a) factors here, there are several which I think are -- I've considered them all, but are most probative.

First, the nature and circumstances of the offense.  The defendant was making a diligent effort to participate in criminal terrorist organization acts against the United States and its military.  The purchase of firearms in the United States had, to me, the clear purpose of exploring the opportunity to commit terrorist acts within the United States.  There was no other real justification.  He could have rented firearms at the firing range if he had simply wanted to practice.  He -- I

share the Government's view that that was an active option on his part and that the references to the potential nightclub attack was real.

The -- we have not talked much about this, but the posting of a video of him with a firearm, an automatic weapon -- a semi-automatic weapon, I think, further highlights the potential dangerousness of the defendant. I think he meant what he said. I think the greater weight of the evidence, frankly, I think by clear and convincing evidence, that he meant what he said to that undercover agent and that his conduct throughout this has been consistent with that.

I've considered the history and characteristics of this defendant. I will say age was a factor. I would not have imposed, had there not been the sentencing cap of 20 years, I would not have imposed life on the defendant. I would not have done that. I have not given up on him, I have not. Just like his family hasn't given up on him, I haven't given up on him.

But I think these are very serious crimes. And I think the -- I think if we had had life as a maximum sentence, I would have imposed this very sentence, 20 years, lifetime supervision. I think that's a reasonable course here that would give the defendant a chance to mature, to study. I've urged him to continue

his education, to improve himself.

I think -- I think there's promise to him. I think he was misguided. And he has a chance now, during these years, to prove that the person he was when he was 18 years old is not the person he's going to be when he is released.

The -- in considering the history, I share the Government's view that the -- that he got a huge break when he was prosecuted as a juvenile. He was committing acts that he could have easily been prosecuted as an adult and gotten many years of sentence. He had his -- he had multiple opportunities to direct his path elsewhere. His age was clearly considered in the decision to process him through the DJJ rather than through the adult criminal courts. He did not take that opportunity. And I think the history here is that he has long-held, troubling, dangerous views in which he was prepared, but for the intervention of the Government, to have acted on those.

And the suggestion that somehow the Government investigators here have acted improperly is completely unfounded. I think they have -- I think they acted professionally, responsibly, and I think they were astute in picking up the potential dangerousness and bringing this matter to a resolution in which there was not a tragic result.

I believe this sentence promotes respect for the law, provides just punishment for the offense, affords an adequate deterrence to criminal conduct, and most importantly to me, protects the public from further crimes of this defendant. And I believe the 20-year sentence is reasonable and appropriate under the circumstances.

Mr. Groeber, did we have a request as to where the defendant might be incarcerated?

**MR. GROEBER:** As close to home as possible.

**THE COURT:** I do make the request, because I know that the -- for family visitation, that would be important. So I do request that they be incarcerated at a location as close to home as possible.

Let me provide the defendant his appeal notice. You can appeal your conviction if you believe your guilty plea was somehow unlawful or involuntary, or if there was some other fundamental defect in the proceeding that was not waived by your guilty plea. You also have the right to appeal your sentence under certain circumstances, particularly if you believe the sentence is contrary to law and was not waived by your guilty plea. You also file -- you must file the appeal within 14 days of the entry of judgment. Further, you have the right to apply to appeal in forma pauperis, and the Clerk of Court will prepare and file a notice of appeal upon your request.

From the Government, are there further matters to come before the Court?

MR. WILLIAMS:  No, Your Honor.  Thank you.

THE COURT:  From the defense?

MR. GROEBER:  No, Your Honor.

THE COURT:  Good luck to you, Mr. Abdin.

This hearing is adjourned.

(WHEREUPON, court was adjourned at 11:54 a.m.)

* * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

s/Karen E. Martin                    7/30/2019
_____      _____
Karen E. Martin, RMR, CRR            Date